THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v DON-
NELL CLAUSELL, Respondent.

Second Department, August 31, 1992

APPEARANCES OF COUNSEL

*Richard A. Brown, District Attorney,* Kew Gardens *(Andrew Zwerling* of counsel), for appellant.

*Leventhal & Bornstein,* Garden City *(Brad A. Leventhal* and *Kenneth Bornstein* of counsel), for respondent.

### OPINION OF THE COURT

LAWRENCE, J.

■ The question to be decided on this appeal is whether the defendant is entitled to a new trial on the ground that the prosecution violated his right to due process by withholding specifically requested *Brady* material from the defense *(see, Brady v Maryland,* 373 US 83). In our view, this question must be answered in the affirmative.

In a two-count indictment, the defendant was charged with criminal possession of a controlled substance in the fourth and seventh degrees, arising out of events which allegedly occurred on November 24, 1989. At the *Mapp* hearing, held on March 19, 1990, immediately prior to jury selection which commenced on the same day, the arresting officer's testimony disclosed the theory of the prosecution, linking the defendant's arrest to a so-called "buy-and-bust" operation.

The officer testified that on November 24, 1989, he was assigned to the Queens Tactical Narcotics Task Force as part of the "back-up team" supporting the buy-and-bust operation.

He received a radio report from an undercover officer reporting that a purchase had been made in the vicinity of a certain intersection together with a description of the seller, and drove to that intersection. He spotted the defendant standing alongside a store on the corner. He testified that he watched as the defendant turned to face him and then entered a store.

The prosecutor specifically inquired of the officer:

"Q. Now, before he turned and walked away from you was there a reason that you were observing him?

"A. The transmission I received from an undercover officer was similar to the description of Mr. Clausell on that day".

The officer testified that after the defendant entered the store, he observed the defendant "through the plateglass window on the side of the store", removing some tinfoil packets and dropping them to the floor. The officer then exited his car, entered the store, recovered four tinfoil packets from the floor, and arrested the defendant.

On cross-examination, the officer made it clear that the reason he observed the defendant was that defendant "fit the description" of the seller. The officer testified that the description he received was "Male, Black, blue coat and a sweatshirt". He also testified there was no description as to facial features or as to age and that he could not recall any description as to the seller's height.

The record establishes that following the suppression hearing and *prior to opening statements,* the defense counsel specifically requested production of the "buy report" and the accompanying "buy corroboration report". Moreover, the trial court ordered the prosecutor to inquire as to the existence of the reports and to produce them. The prosecutor reported back to the court that those reports did not exist.

At the trial, the officer was again asked by the prosecutor on the People's direct case, what drew his attention to the defendant. The officer reiterated: "He fit the description or matched, if you will, the description of an individual we were looking for in reference to the narcotics transaction". On cross-examination at trial, the officer emphasized, "My eyes were strictly on him". "He fit the description of the person we were looking for".

On March 22, 1990, after the arresting officer had concluded his testimony, the defense counsel complained again to the court that the buy report had not been produced. The court again ordered the prosecutor to produce the report, noting

that "[t]here must be some record of the money". When the prosecutor reported once more that there was no buy report, the defense counsel obtained a subpoena duces tecum, directed to the Queens Narcotics Division of the Police Department, for the production of "any and all reports, in particular, buy report pertaining to the [subject] buy". The subpoena was served on March 23, 1990, returnable March 26, 1990.

The buy report was not produced until April 5, 1990, nine days after the defendant's conviction. It revealed, as the trial court found, that the undercover officer's description of the seller "was wholly at odds with the testimony given by [the arresting officer]". The undercover officer referred to the seller as "JD Leather" and described him as approximately 35 years in age, six feet tall, weighing 185 pounds, and wearing a gray cloth coat and black leather pants. The arresting officer had testified that the defendant was wearing a "blue coat and a sweatshirt". Moreover, the record discloses that the defendant was 5 feet 3 inches tall and 27 years of age at the time of his arrest.

Under these circumstances, we agree with the trial court's determination that the defendant is entitled to a new trial. Initially, it is worth noting what is not in dispute. The dissent acknowledges that "[w]here the defense itself has provided specific notice of its interest in particular material, heightened rather than lessened prosecutorial care is appropriate" *(People v Vilardi,* 76 NY2d 67, 77). Indeed, the Court of Appeals has found the "prosecution's failure to turn over specifically requested evidence to be 'seldom, if ever, excusable' and to verge on prosecutorial misconduct" *(People v Vilardi, supra,* at 74; quoting from *People v Brown,* 67 NY2d 555, 559; *United States v Agurs,* 427 US 97, 106). Thus, where, as here, the prosecutor was made aware by a specific discovery request that the defendant considered the material important to the defense, the appropriate standard is whether there is a " 'reasonable possibility' that the failure to disclose the exculpatory report contributed to the verdict" *(People v Vilardi, supra,* at 77).

In addition, the dissent recognizes the rule that where "the outcome of a case turns on the credibility of the complaining witness, evidence impacting adversely on [his] credibility constitutes *Brady* material *(see, People v Cwikla,* 46 NY2d 434)" *(People v Janota,* 181 AD2d 932, 934). However, we do not agree with the dissenter's position that the buy report was not a material impeachment device, since it only concerned "col-

lateral" matters, and that consequently the failure to disclose it did not contribute to the verdict.

As already noted, it was the prosecutor who introduced the evidence, both at the hearing and at trial, that the arresting officer responded to the scene and focused on the defendant, because an undercover officer had provided a description of a seller which allegedly matched the appearance of the defendant. Clearly, the People believed it was necessary to explain why the arresting officer's attention was drawn to the defendant. In fact, the officer's testimony in this regard was important in overcoming doubts about his claim that he saw the defendant drop glassine envelopes. The store owner testified that, contrary to the officer's assertions, there were advertisements on the store window and other obstructions blocking the window. In addition, an investigator testified that when he was positioned at the vantage point reported by the officer he could only see movement of the upper torso of a person's body inside the store. Had the report been available, the defense counsel would have been able to impeach the officer much more thoroughly about his observations; particularly since his description of the seller was "wholly at odds" with that provided in the report by the undercover officer. The defense counsel might even have elected to call the undercover officer as a witness to establish that the defendant had nothing to do with the drug sale.

Thus, it is readily apparent that the report constituted a "material impeachment device" concerning issues central to a determination of guilt. Moreover, as the trial court observed, the People's case "depended almost entirely on the testimony of [the arresting officer]" and his "credibility and reliability as the People's chief witness were important issues in the case". Since there is a " 'reasonable possibility' that the failure to disclose the exculpatory report contributed to the verdict" *(People v Vilardi, supra,* at 77), we find that the trial court correctly determined that the defendant is entitled to a new trial *(see, People v Cwikla,* 46 NY2d 434, 441, *supra).*

■ Finally, we note that on the People's appeal we cannot reach the question of whether the evidence was legally or factually sufficient. The parties have not briefed these issues. Moreover, by law the Appellate Division's review is limited to "any question of law or issue of fact involving error or defect in the criminal court proceedings *which may have adversely affected the appellant"* (CPL 470.15 [1] [emphasis added]). Since this is an appeal by the People, consideration of the

sufficiency of the evidence must await a direct appeal by the defendant if, after the new trial, he is again convicted and sentenced (see, People v Karp, 76 NY2d 1006; People v Goodfriend, 64 NY2d 695).

MANGANO, P. J. (dissenting).

## I.

I disagree with the majority's position that the prosecutor withheld *Brady* material. By indictment No. QN94117/89, the defendant Clausell was charged with the crimes of criminal possession of a controlled substance in the fourth and in the seventh degrees. Specifically, the indictment charged the defendant with illegally possessing more than one eighth of an ounce of cocaine, on November 24, 1989.

A *Mapp* hearing was conducted to determine the admissibility of the physical evidence, i.e., the cocaine, recovered by the arresting police officer. The arresting officer testified at the hearing that on November 24, 1989, he was assigned as a backup officer in a Queens Tactical Narcotics Task Force team designed to investigate narcotics sales. At approximately 4:50 P.M., the arresting officer (who was in plain clothes and an unmarked car), responded to the vicinity of 132nd Street and Rockaway Boulevard, pursuant to a radio transmission from an undercover officer who reported that he had just made a purchase of narcotics at that site. According to the arresting officer, the radio transmission describe the seller of the drugs as "male, black, blue coat and a sweatshirt". The arresting officer also testified that the undercover officer did not describe the seller's facial features, height, or age. As he approached the location, in his car, the arresting officer observed the defendant, who fit the sketchy description in the radio transmission, standing near the corner. The defendant turned to face the arresting officer, "then made a U-turn" and entered "a bodega on the corner, a deli". The arresting officer observed the defendant through the bodega's plateglass window, and saw the defendant reach into his left coat pocket, remove some items, and drop them to the floor. The arresting officer noticed that these items were tinfoil packets, which his "experience and training in the packaging of narcotics" led him to believe contained cocaine. The arresting officer then entered the store, apprehended the defendant, and recovered four tinfoil packets which were on the ground, approximately 1 to 2 feet from the defendant.

The Supreme Court denied that branch of the defendant's omnibus motion which was to suppress the packets of cocaine.

At trial, the arresting officer reiterated his hearing testimony, and added that he made his observation of the defendant dropping the tinfoil packets inside of the store from a distance of 12 to 14 feet, while he was sitting in his car which was stopped on the corner alongside the store. He observed the defendant through one of the store's two plateglass windows, which measured 4 feet by 6 to 8 feet. Although there were advertisements on one of the plateglass windows, the arresting officer testified that the window through which he made his observations had no advertisements on it; indeed, his view of the defendant was, according to his testimony, unobstructed, and the lighting, both in the store and on the street, was good.

On cross-examination of the arresting officer, the defense counsel questioned him concerning his ability to make the aforenoted observations. The defense counsel also pursued the following line of questioning and received the following answers:

"Q. It turns out, doesn't it though, that Mr. Clausel [sic, the defendant] was not the seller that you were looking for that the undercover officer bought drugs from; isn't that right?

"A. Yes.

"Q. As a matter of fact, you never apprehended that seller; did you?

"A. No, I didn't * * *

"Q. Officer, isn't it a fact that you didn't see my client drop any drugs to the ground when you were sitting in your car, but that you made an arrest of Mr. Clausel [sic, the defendant] because you found drugs on the floor and he was there; isn't that right?

"A. No, it's not.

"Q. You had to show an arrest because you lost the seller; isn't that right?

"A. No, it is not".

At the conclusion of the arresting officer's testimony, the defense counsel made a request for any "buy report" made by the undercover officer on November 24, 1989. In support of his request, the defense counsel stated: "[The arresting officer] testified that he had a description that matched my client * * * [T]here might contain material within that buy report

which would indicate whether or not he had, in fact, a description and whether or not that description matched my client". The trial court stated that the prosecutor "claims she has no buy report" and no buy report was disclosed to the defense counsel during the course of the trial. The undercover officer did not testify at the trial; the prosecutor completed her case by calling a police chemist.

The defense called the owner of the bodega, and an investigator for the Legal Aid Society, who impeached the arresting officer's testimony with regard to his claims concerning (1) the distance from his car to the store, and (2) the lack of any obstructions on the window through which he made his observations.

On March 23, 1990, the day that testimony was completed, the defense counsel subpoenaed "any and all" relevant buy reports.

On March 26, 1990, the jury convicted the defendant of criminal possession of a controlled substance in the fourth degree and in the seventh degree, a conviction which, in my view, is both legally and factually sufficient (see, People v Contes, 60 NY2d 620; CPL 470.15 [5]).

## II.

On April 5, 1990, 10 days after the jury verdict, the defense counsel received the requested buy report of the undercover officer. The buy report was prepared by the undercover officer over five hours after the alleged sale, i.e., at 10:15 P.M., and it indicates that the undercover officer transmitted by radio the following description to the arresting officer: "M/B [male black] 6'0" 185 1bs approx 35+ yrs GRY cloth coat. BLK leather pants".

Thereafter, the defense counsel moved to set aside the jury verdict (see, CPL 330.30) on the ground that the undisclosed buy report constituted Brady material, which had been improperly withheld from the defense, thereby depriving the defendant of his right to a fair trial. Specifically, the defense counsel argued as follows:

"9. The undisclosed buy report (Exhibit 'A') reveals, that the unapprehended seller was in fact not a male, black, wearing a blue coat and black sweatshirt, as testified to by [the arresting officer], but was in fact a male, black, wearing a gray coat, and black leather pants. Furthermore, the undisclosed report also reveals that the unapprehended seller was six (6) feet tall and

thirty-five (35) years or more in age. A review of Mr. Clausell's N.Y.S.I.D. sheet clearly indicates that Mr. Clausell is only five foot three inches tall (5′3″), and is merely twenty-seven (27) years of age * * *

"12. Furthermore, the prosecution's failure to turn over the aforementioned reports constitutes the withholding of exculpatory material contrary to fundamental concepts of Due Process and basic Constitutional protections * * *

"15. * * * [I]n the case at bar, the State's entire case depended almost entirely upon [the arresting officer's] testimony. In that instance, the prosecution's withholding of the above stated reports, which contain physical descriptions completely inconsistent to those testified to by [the arresting officer], effectively deprived the defendant of his right to a fair trial".

In opposing the defendant's argument concerning a *Brady* violation, the prosecution argued: "It is firmly established that in order to constitute *Brady* material, the evidence must be both material either to guilt or innocence, and exculpatory, i.e., favorable to the accused * * * Material does not fall within the scope of *Brady* merely because it would assist the defense in forming a strategy * * * In the instant case, nothing contained in the report would support the defendant's claim of innocence. Nor is it material to his defense in any way".

The Supreme Court granted the defendant's motion to set aside the jury verdict, stating:

"It is beyond cavil that suppression by the prosecution of evidence favorable to the defendant, upon request, violates due process where the evidence is material either to guilt or to punishment, 'irrespective of the good faith or bad faith of the prosecution' * * * 'It is equally true that '[w]hen the reliability of a given witness may well be determinative of guilt or innocence', nondisclosure of evidence affecting credibility falls within this general rule' * * *

"At an earlier suppression hearing [the arresting officer] had testified that he focused his attention on the defendant because he matched the description of an alleged seller he was dispatched to the scene to arrest. Yet, the buy report contained a detailed physical and clothing description of the alleged seller which was completely different from the defendant's appearance * * *

"Had the undisclosed report been available during the trial,

the defense would have been buttressed by the inconsistency between the defendant's actual appearance and the description of the person [the arresting officer] was deployed to arrest.

"Clearly [the arresting officer's] credibility and reliability as the People's chief witness were important issues in the case * * * Evidence of the buy report would be relevant on these issues and, in this regard, the buy report is material evidence about which the jury was entitled to know. In this court's view, the defendant has demonstrated that there is a 'reasonable possibility' that the failure to disclose the report contributed to the verdict, particularly in light of the other defense efforts to impeach [the arresting officer's] credibility.

"For the foregoing reasons, this court finds that the prosecutor's failure to turn over the buy report, despite an apparent good faith representation of its nonexistence, constitutes an inexcusable *Brady* violation".

### III.

In *Brady v Maryland* (373 US 83), the United States Supreme Court held that the prosecution must disclose evidence in its possession that is (1) favorable to the defense, and (2) material either to guilt or punishment. This "duty to disclose extends not only to exculpatory matter, but also material evidence which impeaches the credibility of the prosecution witness" *(People v Alongi,* 131 AD2d 767, 768; *see also, United States v Bagley,* 473 US 667, 677-678). The Court of Appeals of this State has recently held that the appropriate standard to measure materiality is whether there is a " 'reasonable possibility' that the failure to disclose the exculpatory report contributed to the verdict" *(People v Vilardi,* 76 NY2d 67, 77).

The two classic examples of *Brady* material can be illustrated in the leading cases of *People v Vilardi (supra)* and *People v Cwikla* (46 NY2d 434). In *People v Vilardi (supra),* the defendant was convicted of arson in the first degree. Damage caused by an explosion is an element of arson in the first degree (Penal Law § 150.20 [1]). The prosecutor failed to turn over to the defense the exculpatory report of the bomb expert which stated that there had been no explosion. In affirming this court's vacatur of the defendant's conviction of arson in the first degree, the Court of Appeals stated: "[T]here was at least a reasonable possibility that defendant would not have been convicted on that count had the exculpatory report

been available to him at trial. That a contemporaneous and avowedly 'thorough' inspection of the bomb site by an expert had led him to conclude that no explosion occurred well might have caused the jury to discount his contrary assertion at trial" *(People v Vilardi, supra,* at 78).

In *People v Cwikla (supra),* the prosecutor failed to turn over correspondence between his office and the Parole Board advising of the cooperation of a principal prosecution witness, and expressing the hope that such cooperation would be taken into account when the witness was considered for parole. The Court of Appeals reversed the defendant's conviction stating:

"It is fundamental that material evidence which is in the possession of the prosecution and which is exculpatory in nature must be turned over to the defendant in order to give meaning to the constitutional right to a fair trial *(Brady v Maryland,* 373 US 83). It is equally true that '[w]hen the "reliability of a given witness may well be determinative of guilt or innocence", nondisclosure of evidence affecting credibility falls within this general rule.' *(Giglio v United States,* 405 US 150, 154, quoting *Napue v Illinois,* 360 US 264, 269.) The existence of an agreement between the prosecution and a witness, made to induce the testimony of the witness, is evidence which must be disclosed under *Brady* principles *(Giglio v United States, supra; Boone v Paderick,* 541 F2d 447, 450).

"The materials sought by defense counsel here—correspondence between the office of the District Attorney and the Parole Board relating to the witness Tommy Cox—were of such a nature that the jury could have found that, despite the witness' protestations to the contrary, there was indeed a tacit understanding between the witness and the prosecution, or at least so the witness hoped. We have on a previous occasion noted that the existence of such an agreement 'might be a strong factor in the minds of the jurors in assessing the witness' credibility and in evaluating the worth of his testimony'. *(People v Savvides,* 1 NY2d 554, 557.) Consequently, in view of the significance which the jury might have attached to this evidence and in keeping with the principles enunciated in *Brady v Maryland* (373 US 83, *supra),* and its progeny, we hold that the nondisclosure of this evidence denied defendant his right to a fair trial" *(People v Cwikla, supra,* at 441; *see also, United States v Bagley,* 473 US 667, 683, *supra* [in a prosecution for violation of Federal narcotics and firearm statutes, evidence that the principal Government witnesses had signed contracts with the Government, whereby the Gov-

ernment agreed to pay the witnesses commensurate with the information furnished, indicated "bias or interest", and constituted *Brady* material]).

Viewed within these parameters, I find that the undercover officer's buy report did not constitute *Brady* material.

With respect to the "exculpatory" element of the defendant's argument, it has been held that "evidence that the defendant may not have committed a crime he was not charged with is irrelevant and inadmissible * * * and is not exculpatory as to the charged crime" *(People v Reynolds,* 104 AD2d 611, 614; *see also, People v Johnson,* 47 NY2d 785, *cert denied* 444 US 857, *affg* 62 AD2d 555). The undercover officer's buy report, viewed in isolation, merely indicates that the defendant was not the man who sold cocaine to the undercover officer. It is not exculpatory with respect to the charged crime, i.e., possession of cocaine in the bodega, at a later point in time.

Nor do I view the undercover officer's buy report as a material impeachment device, under the circumstances presented. It is well settled that evidence which merely impeaches the witness's credibility as to a "collateral" matter *(People v Battee,* 122 AD2d 526, 527) is not material.

The buy report prepared by the undercover officer over five hours after the sale, impeached the arresting officer solely with respect to the issue of what description of the seller was in fact transmitted over the radio. However, the radio transmission concerned a separate criminal transaction which was not used as the basis for defendant's arrest on the subsequent crime of possession of drugs, and was thus collateral to the issue in this case, i.e., whether the defendant was observed possessing drugs in the bodega, at a subsequent time *(see also, People v Walker,* 180 AD2d 700; *People v Thomas,* 116 AD2d 678).

Since I find no *Brady* violation in the instant case, I believe that the order appealed from should be reversed, the defendant's motion denied, and the jury verdict reinstated.

EIBER and MILLER, JJ., concur with LAWRENCE, J.; MANGANO, P. J., dissents and votes to reverse the order appealed

from, to deny the defendant's motion, and to reinstate the jury verdict in an opinion.

Ordered that the order is affirmed and the matter is remitted to the Supreme Court, Queens County, for further proceedings on the indictment.